TODD BLANCHE
Acting Attorney General of the United States
SIGAL CHATTAH
First Assistant United States Attorney
District of Nevada
Nevada Bar Number 8264
JESSICA OLIVA
Assistant United States Attorney
501 Las Vegas Boulevard South, Suite 1100
Las Vegas, Nevada 89101
(702) 388-6336
jessica.oliva@usdoj.gov

LORINDA LARYEA
Chief, Fraud Section
CHRISTOPHER WENGER
SHANE BUTLAND
Trial Attorneys
U.S. Department of Justice
Criminal Division, Fraud Section
1400 New York Avenue, N.W.
Washington, D.C. 20005
(202) 445-9670
christopher.wenger@usdoj.gov

*Attorneys for the United States of America*

FILED / ENTERED / RECEIVED / SERVED ON
COUNSEL/PARTIES OF RECORD
AUG 04 2026
CLERK US DISTRICT COURT
DISTRICT OF NEVADA
BY: DEPUTY

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:26-cr-00166-CDS-BNW-1 |
| Plaintiff, | **CRIMINAL INDICTMENT** |
| vs. | **<u>VIOLATIONS:</u>** |
| STEPHEN DUBIN, M.D., | 18 U.S.C. § 1349 – Conspiracy to Commit Health Care Fraud (Count One) |
| Defendant. | 18 U.S.C. § 1347 – Health Care Fraud<br>18 U.S.C. § 2 (Counts Two through Six) |
| | <u>FORFEITURE ALLEGATIONS</u> |

**THE GRAND JURY CHARGES THAT:**

At all times material to this Indictment, within the District of Nevada and elsewhere:

**INTRODUCTION**

1. Defendant STEPHEN DUBIN was a resident of Henderson, Nevada, in the District of Nevada. STEPHEN DUBIN was a medical doctor licensed by the State of Nevada.

2. STEPHEN DUBIN owned, controlled, and operated Dubin Medical Consultants, Inc. ("DMC"), also known as Wound MD. DMC was a corporation formed under the laws of Nevada, with its principal place of business in Henderson, Nevada. DMC was an enrolled Medicare provider and submitted claims to Medicare for payment, including claims for expensive amniotic membrane allografts made from human placental tissue ("allografts").

3. Licensed Practical Nurse 1 ("LPN 1") was a resident of Las Vegas, Nevada, in the District of Nevada. LPN 1 was a licensed practical nurse licensed by the State of Nevada who worked as an independent contractor for DMC.

4. "Company 1" consisted of two separate entities owned by the same individual, both of which were limited liability companies formed under the laws of Nevada, with their principal place of business in Las Vegas, Nevada. Company 1 marketed and distributed allografts, including allografts sold by Company 2, to DMC, among other health care providers.

5. "Company 2" was a limited liability company formed under the laws of Texas, with its principal place of business in Fort Worth, Texas. Company 2 was a wholesale distributor of allografts.

. . .

. . .

**The Medicare Program**

6. The Medicare program ("Medicare") was a federal health care program providing benefits to persons who were 65 years of age and older or disabled. Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services ("HHS"). Individuals who received benefits under Medicare were referred to as Medicare "beneficiaries."

7. Medicare was a "health care benefit program," as defined by 18 U.S.C. § 24(b), and a "Federal health care program," as defined by 42 U.S.C. § 1320a-7b(f), and affected interstate commerce.

8. Medicare covered different types of benefits and was separated into different program "parts." Medicare "Part B" covered, among other things, medical items and services provided by physicians, nurse practitioners, group practices, and other qualified health care providers (collectively, "providers"), that were medically necessary and ordered by licensed medical doctors or qualified health care providers.

9. Providers that provided services to beneficiaries were able to apply for and obtain a "provider number." A provider that received a Medicare provider number was able to file claims with Medicare to obtain reimbursement for items and services provided to beneficiaries.

10. A Medicare claim was required to contain certain information, including: (a) the beneficiary's name; (b) a description of the health care benefit, item, or service that was provided or supplied to the beneficiary; (c) the billing codes for the benefit, item, or service; (d) the date upon which the benefit, item, or service was provided or supplied to the beneficiary; and (e) the name of the referring or rendering physician or other health care provider, as well as a unique identifying number, known either as the Unique Physician

Identification Number ("UPIN") or National Provider Identifier ("NPI"). The claim form could be submitted in hard copy or electronically via interstate wire.

11. To enroll as a Medicare provider, Medicare required providers to agree to abide by Medicare laws, regulations, and program instructions. Medicare further required providers to certify that they understood that payment of a claim by Medicare was conditioned upon the claim and the underlying transaction complying with these laws, regulations, and program instructions, including the Federal Anti-Kickback Statute. Medicare paid for claims only if the items and services were medically reasonable, medically necessary for the treatment or diagnosis of the beneficiary's illness or injury, accurately documented, and provided as represented to Medicare. Medicare would not pay for items and services that were procured through kickbacks and bribes.

12. Medicare covered access to certain bioengineered skin substitutes, including allografts. These allografts were applied to open, chronic wounds to assist with wound closure or skin growth. Medicare reimbursed providers for certain allografts furnished to Medicare beneficiaries only if the allografts were medically reasonable, medically necessary for the treatment or diagnosis of the beneficiary's illness or injury, accurately documented, provided as represented to Medicare, and not procured through illegal kickbacks. Medicare reimbursed claims for allografts at high rates, exceeding $1,000 per square centimeter for certain allografts.

13. Medicare, in receiving, processing, and adjudicating claims, acted through fiscal intermediaries called Medicare Administrative Contractors ("MACs"), which were statutory agents of CMS for Medicare Part B. The MACs were private entities that reviewed claims and made payments to providers for items and services rendered to beneficiaries. The

MACs were responsible for processing Medicare claims arising within their assigned geographical jurisdictions.

14. CMS contracted with Noridian Healthcare Solutions, LLC ("Noridian") to administer Medicare Part B claim payments in Nevada, which included claims for allografts. As a MAC, Noridian implemented CMS rules in its jurisdictions and issued directives to providers and others regarding Medicare claims submission and billing requirements, among other topics.

15. Medicare reimbursed claims for certain allografts under Part B. Allograft manufacturers and labelers were required to report quarterly to Medicare their total sales and units sold to all purchasers in the United States for each allograft product. Based on that data, Medicare calculated the product's Average Sales Price ("ASP"). Before the ASP for an allograft was published by Medicare for a new allograft product on the market, Noridian reimbursed claims for allografts based on the cost that manufacturers and labelers, including Company 2, charged providers for allografts for which Medicare had not yet published the ASP.

16. Beginning in or around June 2022, Noridian required Medicare providers within its jurisdiction to include the "total invoice price" in claims submitted for allografts that did not have a Medicare ASP. Noridian defined the "total invoice price" as the net amount a provider paid for an item or service "taking into account **ALL** discounts, rebates, refunds, or other adjustments."

17. Beginning in or around November 2022, Noridian required Medicare providers within its jurisdiction to report and return to Medicare any additional amount received by the provider in the form of discounts, rebates, refunds, or other adjustments as overpayments for allografts previously billed to and reimbursed by Medicare that did not

have a Medicare ASP. Noridian specified that if a provider, for example, reported and billed Medicare for the total invoice price of an item, resulting in a Medicare payment, and received a rebate or discount after the Medicare payment, the difference between the amount Medicare paid and the rebate or discount received constituted an overpayment. Noridian further specified that providers such as DMC were required to report all overpayments and refund the overbilled amount to Medicare. Noridian also specified that neither the timing of the rebate nor the form or type of program in which the rebate was presented affected the provider's obligation to pass on the rebate to Medicare.

**COUNT ONE**
**Conspiracy to Commit Health Care Fraud**
**(18 U.S.C § 1349)**

18. The factual allegations in paragraphs 1 through 17 are incorporated by reference and re-alleged as though fully set forth herein.

19. From in or around April 2021 to in or around September 2024, in the State and Federal District of Nevada and elsewhere,

**STEPHEN DUBIN,**

defendant herein, and LPN 1, along with other individuals and entities known and unknown to the grand jury, knowingly and willfully agreed and conspired with each other and others to commit health care fraud in violation of 18 U.S.C. § 1347.

**Purpose of the Conspiracy**

20. It was a purpose of the conspiracy for Defendant STEPHEN DUBIN, LPN 1, and their co-conspirators to unlawfully enrich themselves by, among other things: (a) submitting and causing the submission of false and fraudulent claims to Medicare for items and services that were (i) medically unreasonable and unnecessary, (ii) ineligible for reimbursement, (iii) not provided as represented, and (iv) procured through illegal kickbacks

and bribes; (b) concealing and causing the concealment of false and fraudulent claims to Medicare; and (c) diverting proceeds of the fraud for the personal use and benefit of Defendant, LPN 1, and others, and to further the fraud.

**Manner and Means of the Conspiracy**

21. The manner and means by which Defendant STEPHEN DUBIN, LPN 1, and their co-conspirators sought to accomplish the purpose of the conspiracy included, among other things, the following:

***Formation of DMC and Certifications to Medicare***

a. In or around April 2021, after the owner of Company 1 informed STEPHEN DUBIN that there was an opportunity to profit from billing Medicare for allografts, STEPHEN DUBIN formed DMC.

b. In or around October 2021, STEPHEN DUBIN enrolled DMC as a Medicare provider. STEPHEN DUBIN certified to Medicare as DMC's Authorized Official that he would comply with all of Medicare's laws, regulations, and program instructions and that he would not knowingly present or cause to be presented a false or fraudulent claim for payment to Medicare. STEPHEN DUBIN also certified to Medicare as DMC's Authorized Official that he understood that payment of a claim by Medicare was conditioned upon the claim and the underlying transaction complying with the Federal Anti-Kickback Statute.

***Receiving and Concealing Illegal Kickbacks and Lying to Medicare about the Actual Acquisition Cost of Allografts***

c. STEPHEN DUBIN agreed with others to receive and did receive illegal kickbacks, bribes, and rebates in exchange for purchasing allografts from Company 1 and Company 2. These illegal payments were falsely structured to appear as legitimate

"Rebate Agreements" while concealing and disguising their true nature as illegal payments in exchange for orders and purchases of Company 1 and Company 2 allografts.

d. To profit from billing Medicare for allografts, STEPHEN DUBIN, through DMC, agreed to receive 45% rebates on allografts purchased from Company 1 and Company 2. As STEPHEN DUBIN and others agreed and intended, the rebates substantially reduced the true net cost of acquiring the allografts and were concealed from Medicare, such that STEPHEN DUBIN and others did not disclose that the actual acquisition cost of the allografts was materially lower than the amounts being represented to Medicare.

e. STEPHEN DUBIN and others, through DMC, submitted and caused to be submitted false and fraudulent claims to Medicare seeking reimbursement at the full invoice price of allografts purchased from Company 1 and Company 2, instead of the actual rebated price paid for the allografts, and STEPHEN DUBIN and others kept as profit the difference between Medicare's reimbursement and the price paid for the allografts, without disclosing the price difference to Medicare.

f. STEPHEN DUBIN and others, through DMC, falsely billed Medicare the full invoice price, rather than the actual rebated price paid for the allografts, after Noridian, in June and November 2022, required providers such as DMC to submit claims based on the "total invoice price," defined as the net amount paid for an item taking into account all discounts, rebates, and other adjustments, and after STEPHEN DUBIN and others knew of Noridian's reporting requirements.

g. For claims STEPHEN DUBIN submitted and caused to be submitted to Medicare after November 2022 that were based on the full invoice price of Company 1 and Company 2's allografts, STEPHEN DUBIN neither reported nor returned to Medicare

the rebate and discount amounts he received from Company 1 and Company 2 after Medicare had reimbursed STEPHEN DUBIN, through DMC, based on the non-rebated and non-discounted claim amounts submitted, despite knowing that Noridian required him and DMC to do so.

h. STEPHEN DUBIN and others concealed and disguised the actual acquisition cost of the allografts purchased from Company 1 and Company 2 by, among other ways, submitting claims to Medicare using the amounts listed on sham invoices provided by Company 1 and Company 2 that reflected the full invoice price, not the rebated and discounted price that STEPHEN DUBIN, through DMC, in fact paid for the allografts.

***Receiving and Concealing Illegal Kickbacks Through a Shell Company and Lying to Medicare about the Actual Acquisition Cost of Allografts***

i. To continue to profit from billing allografts to Medicare, and to evade Noridian's rebate reporting requirements, in or around March 2023, STEPHEN DUBIN, through DMC, agreed to receive kickbacks, and subsequently did receive kickbacks, from Company 2 through a shell company. Specifically, after billing Medicare the full invoice price of Company 2 allografts and after Medicare reimbursed the amount submitted in the claim, STEPHEN DUBIN, though DMC, paid the full amount of Medicare's reimbursement to Company 2. Company 2 immediately transferred that amount to an account controlled by Company 2 but held in the name of a shell company. Company 2 then kicked approximately 40% of that amount from the pass-through bank account back to STEPHEN DUBIN, through DMC, as an illegal kickback and bribe in exchange for purchasing Company 2 allografts.

j. STEPHEN DUBIN neither reported nor returned to Medicare the money Company 2 kicked back to him through the pass-through bank account in the name

of the shell company after Medicare had reimbursed STEPHEN DUBIN, through DMC, despite knowing that Noridian required him and DMC to do so.

k. STEPHEN DUBIN and others concealed and disguised the actual acquisition cost of the allografts purchased from Company 2 by, among other ways, submitting claims to Medicare using the amounts listed on sham invoices provided by Company 2 that did not reflect the 40% kickback that STEPHEN DUBIN, through DMC, intended to receive, and did receive, through the shell company.

***Billing Medicare for Allografts That Were Medically Unnecessary and Ineligible for Reimbursement***

l. As a result of the profit and anticipated profit from billing Medicare for allografts, STEPHEN DUBIN and LPN 1 ordered and caused the ordering of allografts from Company 1 and Company 2, applied and caused others to apply medically unreasonable and unnecessary allografts to Medicare beneficiaries, and submitted and caused to be submitted false and fraudulent claims to Medicare for allografts that were medically unreasonable and unnecessary, ineligible for Medicare reimbursement, and procured through illegal kickbacks and bribes.

m. STEPHEN DUBIN, LPN 1, and others targeted facilities with elderly populations, such as home health agencies and hospices, to identify Medicare beneficiaries with wounds.

n. STEPHEN DUBIN and LPN 1 recruited nurse practitioners to apply allografts to Medicare beneficiaries, and STEPHEN DUBIN pressured the nurse practitioners to apply allografts to Medicare beneficiaries without regard to medical necessity.

o. STEPHEN DUBIN and LPN 1 applied, and caused others to apply, allografts to Medicare beneficiaries that were medically unreasonable and unnecessary because, among other reasons, allografts were applied without attempting, completing, or confirming conservative wound care treatment; allografts were applied to non-chronic wounds; allografts were applied to infected wounds; allografts were applied to wounds that were not responding to allograft treatments; allografts were applied to wounds that would not heal because of certain terminally ill patients' comorbidities; allografts were applied without attempting to manage or control patient conditions affecting the ability of a wound to heal; allografts were applied in sizes that exceeded the size of the wound; and the allografts applied were selected to maximize profit, not based on the patient's need.

p. As STEPHEN DUBIN knew and agreed, LPN 1 applied allografts to Medicare beneficiaries that were billed to Medicare, even though applying allografts was not within the authorized scope of practice for LPN 1 as a licensed practical nurse.

q. In each claim to Medicare, STEPHEN DUBIN falsely certified and caused others to falsely certify that the allografts billed to Medicare were medically necessary, provided as represented, and not induced by kickbacks and bribes.

r. To conceal and disguise the lack of medical necessity for the allografts, STEPHEN DUBIN falsified, and caused the falsification of, patient medical records to make it appear as though the application of allografts was medically reasonable and necessary and met Medicare requirements.

s. STEPHEN DUBIN falsified, and caused others to falsify, patient medical records submitted in connection with a post-payment claim review conducted by a Medicare contractor.

t. In total, STEPHEN DUBIN, LPN 1, and others, through DMC, submitted and caused the submission of more than $95 million in false and fraudulent claims to Medicare for allografts that were medically unreasonable and unnecessary, not provided as represented, ineligible for reimbursement, and procured through illegal kickbacks. As a result of these false and fraudulent claims, Medicare paid DMC more than $54 million.

u. STEPHEN DUBIN used the proceeds of the conspiracy and fraud scheme to fund a lavish lifestyle and purchase luxury items, including having multi-million-dollar yachts built for him.

All in violation of 18 U.S.C. § 1349.

**COUNTS TWO THROUGH SIX**
**Health Care Fraud**
**(18 U.S.C. § 1347 and 18 U.S.C. § 2)**

22. The factual allegations in paragraphs 1 through 17 are incorporated by reference and re-alleged as though fully set forth herein.

23. From in or around April 2021 to in or around September 2024, in the State and Federal District of Nevada and elsewhere,

**STEPHEN DUBIN,**

defendant herein, and LPN 1, along with other individuals and entities known and unknown to the grand jury, in connection with the delivery of, and payment for, health care benefits, items, and services, did knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud a health care benefit program affecting commerce, as defined by 18 U.S.C. § 24(b), that is, Medicare, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, Medicare.

**Purpose of the Scheme to Defraud**

24. Paragraph 20 is incorporated by reference and re-alleged as though fully set forth herein as the purpose of the scheme.

**Manner and Means of the Scheme to Defraud**

25. Paragraph 21 is incorporated by reference and re-alleged as though fully set forth herein as the manner and means of the scheme to defraud.

**Executions of the Scheme to Defraud**

26. On or about the dates specified below, Defendant STEPHEN DUBIN executed and attempted to execute the scheme and artifice to defraud by submitting and causing to be submitted the following false and fraudulent claims to Medicare, with each execution set forth below constituting a separate violation of 18 U.S.C. § 1347:

| Count | Medicare Beneficiary | Approx. Date of Service | Approx. Date Claim Submitted | Approx. Amount Billed to Medicare | Approx. Amount Paid by Medicare |
|---|---|---|---|---|---|
| **2** | K.D. | 4/13/2022 | 4/18/2022 | $7,200 | $4,498 |
| **3** | M.L. | 7/27/2022 | 8/3/2022 | $2,700 | $1,858 |
| **4** | F.G. | 9/21/2022 | 10/7/2022 | $64,000 | $49,097 |
| **5** | P.R. | 1/30/2023 | 2/8/2023 | $6,000 | $4,636 |
| **6** | M.D. | 3/4/2024 | 3/20/2024 | $58,547 | $45,901 |

**<u>FORFEITURE ALLEGATION</u>**
**Conspiracy to Commit Health Care Fraud and Health Care Fraud**

27. The allegations contained in paragraphs 1 through 17 above and in Counts One through Six of this Criminal Indictment are hereby realleged and incorporated herein

by reference for the purpose of alleging forfeiture under 18 U.S.C. § 981(a)(1)(C) with 28 U.S.C. § 2461(c) and 18 U.S.C. § 982(a)(7).

28. Upon conviction of any of the felony offenses charged in Counts One through Six of this Criminal Indictment,

**STEPHEN DUBIN,**

defendant herein, shall forfeit to the United States of America, any property, real or personal, which constitutes or is derived from proceeds traceable to violations of 18 U.S.C. § 1347, a specified unlawful activity as defined in 18 U.S.C. § 1956(c)(7)(F), involving a Federal health care offense as defined in 18 U.S.C. § 24, or 18 U.S.C. § 1349, conspiracy to commit such offense:

defendant herein, shall forfeit to the United States of America, property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of 18 U.S.C. §§ 1347 and 1349, involving a Federal health care offense as defined in 18 U.S.C. § 24:

a. any and all property with the requisite nexus to violations of 18 U.S.C. §§ 1347 and 1349, and subject to forfeiture under 18 U.S.C. § 981(a)(1)(C) with 28 U.S.C. § 2461(c), 18 U.S.C. § 982(a)(7), and Fed. R. Crim. P. 32.2(b)(2)(C); and

b. an in personam criminal forfeiture money judgment including, but not limited to, at least an amount to be calculated, and subject to forfeiture under 18 U.S.C. § 981(a)(1)(C) with 28 U.S.C. § 2461(c), 18 U.S.C. § 982(a)(7), and Fed. R. Crim. P. 32.2(b)(2)(C)

(all of which constitutes property).

29. If any property subject to forfeiture under 18 U.S.C. § 981(a)(1)(C) with 28 U.S.C. § 2461(c) and 18 U.S.C. § 982(a)(7), as a result of any act or omission of the defendant–

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States of America, under 21 U.S.C. § 853(p), to seek forfeiture of any other property of the defendant for the property listed above.

. . .

. . .

. . .

. . .

. . .

. . .

. . .

. . .

. . .

. . .

. . .

. . .

. . .

All under 18 U.S.C. § 981(a)(1)(C) with 28 U.S.C. § 2461(c); 18 U.S.C. § 982(a)(7); 18 U.S.C. §§ 1347 and 1349; and 21 U.S.C. § 853(p).

**DATED:** This 4th day of August 2026.

**A TRUE BILL:**

/S/
FOREPERSON OF THE GRAND JURY

TODD BLANCHE
Acting Attorney General

JESSICA OLIVA
Assistant U.S. Attorney

LORINDA LARYEA
Chief, Fraud Section
Criminal Division

CHRISTOPHER WENGER
SHANE BUTLAND
Trial Attorneys